171 N.W.2d 166 (1969)
184 Neb. 659
OCCIDENTAL SAVINGS AND LOAN ASSOCIATION, a Corporation, Appellant,
v.
John L. CANNON and Jane B. Cannon, husband and wife, Joyce Lumber Co., a Corporation, Appellees,
Impleaded with McKean Floor Covering, a Corporation, Appellant.
No. 37221.
Supreme Court of Nebraska.
October 10, 1969.
*167 Lloyd E. Atchley, Kennedy, Holland, De-Lacy & Svoboda, C. E. Heaney, Jr., Lyman L. Larsen, Omaha, for Occidental Savings & Loan Assn.
Fellman & Stern, Omaha, for McKean Floor Covering.
John H. Trenerry, Jr., James R. McGreevy, Omaha, for appellees
Heard before WHITE, C. J., and CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN and NEWTON, JJ.
SPENCER, Justice.
This action was commenced as a foreclosure of a mortgage but has devolved into a contest between the mortgagee against as well as between two defendant mechanic's lien claimants.
John L. Cannon, hereafter referred to as Cannon, and Jane B. Cannon, the mortgagors, failed to plead herein and were defaulted. The trial court determined that Joyce Lumber Company, a corporation, *168 hereinafter referred to as Joyce, had a mechanic's lien with a first priority; the mortgage of Occidental Savings and Loan Association, a corporation, hereinafter referred to as Occidental, was found to be second in priority; and the McKean Floor Covering, Inc., a corporation, hereinafter referred to as McKean, was third in priority. Occidental and McKean perfected an appeal to this court. The action is here for trial de novo. York Brick & Tile Co. v. Ude Motor Co., 123 Neb. 154, 242 N.W. 361.
The parties stipulated as to the validity of the Occidental mortgage and that as of September 30, 1968, there was $21,720.88 due thereon. They stipulated further that McKean furnished lumber and materials and had a valid lien in the amount of $636 plus $3.25 filing fee and interest at 6 percent from April 20, 1967. The evidence indicates that Joyce, from a blueprint provided by Cannon, furnished an estimate of materials to be used on a job at 2030 No. 104th Street, the property in question. The total of the estimate was $4,434.24.
The evidence is undisputed that Cannon was not obligated to purchase any of his material from Joyce and Joyce was not to deliver material except upon order, but any material purchased by Cannon would be furnished at the price listed in the estimate. The first material furnished Cannon was under date of November 26, 1965. This was previous to the filing of the Occidental mortgage. As of March 30, 1966, Joyce had furnished material to the value of $4,430.09 for this particular job. Subsequent to that date, items in the following amounts and dated as shown, were charged or credited to the account:

Date Amount
4/1/66 $ 5.46
4/4/66 46.95
4/11/66 39.70
6/9/66 60.55
6/9/66 (credit for trim returned) 11.44
8/12/66 8.40

With the exception of the item of August 12, 1966, all of the items, which are exhibits 3 through 6, show that they were delivered to 2023 No. 104th Street, and that subsequently the address of the place of delivery was changed to 2030 No. 104th Street. The deliveryman was not produced as a witness so there is no testimony as to where delivery was actually made on these items. Cannon was building at 2023 No. 104th Street. The item of June 9, 1966, for $60.55, exhibit 6, is for seven pair of window shutters. There is uncontradicted testimony there are no window shutters on 2030 No. 104th Street. Cannon testified they were used on 2023 No. 104th Street. The item of August 12, 1966, which is exhibit 8, reads as follows:

 "Date 8/12 1966
"Sold to Jack Cannon
"Address
"Deliver to Job 2030 So. 104
"Sold by JC Delvd by Mike Charge X * * *
"Pieces Description * * * Price Amount
-----------------------------------------------------------------
 "1 pr 14 x 68 Door Shutters 8.40 8.40
 * * * "Total $8.40
"Received by Mrs. Jack Cannon."

John Chambers, a Joyce employee, testified that Cannon phoned in the order shown on exhibit 8 and told him to deliver it to 2030 So. 104th Street to get the shutters primed. The order was actually receipted for by Mrs. Jack Cannon at 2036 No. 104th Street, which is the house next door to 2030 No. 104th Street.
*169 Cannon testified that when he returned home he immediately took the shutters from the garage at 2030 No. 104th Street across the street to 2023 No. 104th Street, where they were stored in the basement, and later they were put on that property. It is his further testimony that the plans were changed after the estimate, and that door shutters could not be used on 2030 No. 104th Street. The appearance of the front of the house was so changed that door shutters were no longer appropriate. Cannon also testified that the residence at 2030 No. 104th Street was substantially completed in May 1966.
Joyce did not file its mechanic's lien until November 21, 1966. Section 52-103, R. R.S.1943, provides that a materialman shall file his lien within 4 months of the time he furnished his material. This has been interpreted to mean 4 months from the date of the last item furnished under the contract. Nye & Schneider Co. v. Berger, 52 Neb. 758, 73 N.W. 274. The Joyce lien herein was filed within 4 months of the August 12, 1966, delivery, but more than 4 months after all of the other material had been furnished and more than 4 months after the house was substantially completed. For Joyce to have a valid lien, we must find that the material furnished on August 12, 1966, may be tacked onto the previous orders for the purpose of extending lienfiling time.
The burden of proof is upon one claiming a mechanic's lien to prove that his claim was filed in time to create a lien. Lofholm v. Stoltenberg, 178 Neb. 318, 133 N.W.2d 387.
The first pertinent question is the nature of the contract between Joyce and Cannon. Was it one continuous contract for the furnishing of material during the construction of the house, or was it several different contracts? All the record indicates is that Cannon had secured a construction plan he thought he might follow in building a house, and furnished it to Joyce who prepared a material estimate for him.
On this point, the testimony of the district manager for Joyce was as follows: "Q. Who in your organization, Mr. Herrin, would have handled the matter; had there been a contract with Mr. Cannon to furnish the matterial? Would the estimator handle that matter? A. If I understand your question, the estimator took the plan and was charged with the responsibility of taking off quantities of materials and furnishing an estimate of quantities needed to do the job, in accordance with the plans and the instructions of the customer. Q. And that estimate was returned to Mr. Cannon for his use? A. I can't say it was, to my knowledge. It would be common procedure. Q. Do you know, following that, whether or not there was ever any contract entered into between Joyce Lumber Company, and Mr. Cannon? A. It's common procedure when we furnish the contractor with an estimate, if he orders material on that, we assume that is a contract. Q. You furnished him with an estimate, and from that estimate, he gives an order, and you fill the order; that is customary? A. It's customary; there are deviations from time to time from the estimate. Q. You're assuming that the customary procedure was followed in the Cannon case? A. I assume it was. Q. Now, the prices shown on the estimate, do they become the prices charged them when the orders are made by the builder and delivery is made? A. That is customary. * * * Q. In other words, would it be fair to say there are changes made from the time the plans or the blueprints are prepared until the material is ordered? A. Changes are made during the process of construction. Where an estimator might anticipate that one length of material might do the job, the man building it might decide he needs something else. Quite often, actual items on sales tickets do not agree with the sales ticket. Q. Orders are placed with the recommendations of the builders rather than following the plan or estimate? A. It's common procedure for the carpenter on the job to order materials as he needs them. * * * Q. Mr. Herrin, you stated *170 I believe, that when items are ordered pursuant to one of these estimates such as Exhibit 2, that the Joyce Lumber Company considers it then to be a contract, is that correct? A. Yes, sir. Q. Is there any obligation on the part of the contractor or the builder to order everything that's on this estimate? A. No, sir. Q. And is the price that's on here guaranteed? A. We guarantee the price, yes, sir. Q. If the market on lumber goes up, it's still the price on the estimate? A. We guarantee the price on the completion of the job, on the basis of the estimate. Q. Does the Joyce Lumber Company, you, or someone under your supervision, compare the orders to the estimate? A. Your question is, do we compare the tickets with the estimates? Q. Yes, sir. A. It's common procedure for the tickets to be prepared from the estimates unless there is some change or deviation of material ordered by the contractor. That quite often happens. Q. Let's talk about material ordered; does the Joyce Lumber Company make any attempt to keep track of which items on the estimate are actually ordered out? A. Well, on the estimate, if the contractor wants us to follow the estimate, we will make up our loading tickets from the estimate; some contractors prefer that. They sometimes prefer to order the material when they need it. We were delivering what was ordered. Q. So, in reality, this really wasn't a contract between Joyce Lumber and Mr. Cannon? A. Well, in reality it was a contract to buy material for that house when we started delivery. We don't care whether or not he uses a 2 by 4, 10 or 2 by 4, 20. We considered that a contract. That's common procedure in the industry. Q. Was there anything to prevent him from buying one-half of this material from Rivett? A. Well, that's been done. Q. You don't have anything to bind him, or to obligate him to buy all of this material from the Joyce Lumber Company? A. Put it this way: we never had any difficulty. Q. You didn't have anything to bind him to buy everything on this estimate from Joyce Lumber, did you? A. No, sir."
We determine there was no continuous contract herein. On the record the estimate was nothing more than an offer to furnish designated material at the price quoted. As material was ordered, a contract was implied for that particular order.
Assuming, however, that Joyce and Cannon had only one contract, the lien would still be invalid. It is undisputed that the house was substantially completed by May 1966. The lien herein was not filed until November 21, 1966. Assuming for the purposes of this case that the items covered by exhibits 3 through 6 were actually delivered to the property, the 4-month period would not expire until September, so Joyce on that assumption would still have been within the lien period in August 1966, when the door shutters described in exhibit 8 were delivered.
Regardless of any inference from language in some of our cases that it must be shown that the items delivered to the property were actually used thereon, we adhere to the rule enunciated in A. H. Weir & Co. v. Barnes, 38 Neb. 875, 57 N.W. 750: The lien of a materialman for materials furnished for the erection of a building by virtue of an agreement with the contractor extends to such materials only as are used in or delivered at the building for use therein.
It is not necessary that a materialman stay on the job to see that the material furnished by him is actually used thereon. Here, however, the evidence is uncontradicted that the door shutters could not have been used on this property, and this fact was evident from the appearance of the house itself. This would negative any inference that the door shutters were intended for 2030 No. 104th Street, which might be assumed from delivery at that address.
*171 We also observe that after a contract for material or labor is substantially completed, there should be no unreasonable delay in filing a claim for a lien if one is desired, and the time for filing a lien cannot be delayed by performing minor labor or furnishing minor items of material. The purpose of the mechanic's lien statute is to protect the diligent contractor or materialman, not to provide relief for the careless or negligent one. To permit a contractor or a materialman to string out work on orders is to abort the statute. If the time which is restricted by the statute can be indefinitely extended by minor work or deliveries after a contract is substantially completed, the 4-month limitation period in which to file this class of lien can and will be utterly and completely defeated, permitting the title to property to remain in an unsettled condition, and rights of diligent claimants will be subordinated to those who carelessly or unnecessarily delay to claim their rights.
For the reasons stated, we reverse the judgment of the trial court and remand the cause for the entry of a judgment in conformity with this opinion.
Reversed and remanded with directions.
NEWTON, Justice (concurring).
I concur in the result arrived at in the opinion of Spencer, J. I note, however, that the opinion contains the following language: "We determine there was no continuous contract herein. On the record the estimate was nothing more than an offer to furnish designated material at the price quoted. As material was ordered, a contract was implied for that particular order." (Emphasis supplied.) Being apprehensive that the foregoing statement indicates a separate implied contract was entered into each time materials were ordered and delivered for the construction of the house in question and that if such were construed to be the law it would then be necessary to file separate mechanic's liens on the same account at regular 4-month intervals, I am inclined to take exception to this statement.
"An `open running' account has been defined as one which is based upon a connected series of transactions, and which has no break or interruption." 1 Am.Jur. 2d, Accounts and Accounting, s. 4, p. 373.
"An open account results where the parties intend that the individual items of the account shall not be considered independently, but as a connected series of transactions, and that the account shall be kept open and subject to a shifting balance as additional related entries of debits and credits are made, until it shall suit the convenience of either party to settle and close the account, and where, pursuant to the original express or implied intention, there is but one single and indivisible liability arising from such series of related and reciprocal debits and credits." 1 Am.Jur. 2d, Accounts and Accounting, s. 4, p. 373. "In order to establish a mutual and open current account it must appear that an account was kept, and that the parties regarded the items as constituting one account and as capable of being set off one against the other so that it is the balance only which constitutes the claim." 1 Am. Jur.2d, Accounts and Accounting, s. 6, p. 376. See, also, Annotations, 1 A.L.R. 1060, 39 A.L.R. 369, 57 A.L.R. 201.
Nebraska has consistently agreed with this interpretation and held that an open account presented but one cause of action upon which the statute of limitations commences to run only from the date of the last entry. See, Heineman v. Thimgan, 136 Neb. 357, 285 N.W. 920; Lewis v. Hiskey, 166 Neb. 402, 89 N.W.2d 132.
WHITE, C. J., joins in this concurrence.